

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

CLE... ...COURT
N... ...OF TX
...21 JAN -5 PM 4: 03

...UTY CLERK_____ *CT*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | No: **3-21CR0011-L** |
| v. | § | |
| | § | |
| SURGICAL CARE AFFILIATES, LLC | § | |
| and SCAI HOLDINGS, LLC | § | |
| | § | |
| Defendants. | § | |

## INDICTMENT

The Grand Jury charges that:

1.     SURGICAL CARE AFFILIATES, LLC and SCAI HOLDINGS, LLC are

hereby indicted and made defendants on both Counts contained in this Indictment.

### COUNT ONE
Conspiracy in Restraint of Trade to Allocate Employees
(Violation of 15 U.S.C. § 1)

At times relevant to this Count:

2.     Defendant SURGICAL CARE AFFILIATES, LLC was a company

organized and existing under the laws of Delaware with its principal places of business in

Birmingham, Alabama and Deerfield, Illinois.  Defendant SCAI HOLDINGS, LLC was a

company organized and existing under the laws of Delaware, and was the successor

entity to Surgical Care Affiliates, Inc.  Collectively, the defendants did business as

Surgical Care Affiliates ("SCA").  SCA owned and operated outpatient medical care

**Indictment – Page 1 of 11**

facilities across the United States. SCA employed individuals to operate its business at its headquarters locations and at other locations across the United States.

3.     Individual 1 served as the Chief Executive Officer ("CEO") of SCA.

4.     Company A was a company organized and existing under the laws of Delaware with its principal place of business in Dallas County within the Northern District of Texas. Company A owned and operated outpatient medical care facilities across the United States and employed individuals to operate its business at its headquarters location and at other locations across the United States.

5.     Individual 2 served as the CEO of Company A.

6.     SCA and Company A were competitors in the recruitment and retention of senior-level employees across the United States.

7.     Various companies and individuals, not made defendants in this Count, participated as co-conspirators in the offenses charged herein and performed acts and made statements in furtherance thereof.

8.     Whenever in this Count reference is made to any act, deed, or transaction of any company, the allegation means that the company engaged in the act, deed, or transaction by or through its officers, directors, agents, employees, or other representatives while they were actively engaged in the management, direction, control, or transaction of its business or affairs.

9.     Beginning at least as early as May 2010 and continuing until at least as late as October 2017, the exact dates being unknown to the Grand Jury, in part in the Northern District of Texas and elsewhere, SCA and Company A entered into and

Indictment – Page 2 of 11

engaged in a conspiracy to suppress competition between them for the services of senior-level employees by agreeing not to solicit each other's senior-level employees. The conspiracy engaged in by SCA and co-conspirators was a *per se* unlawful, and thus unreasonable, restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act (15 U.S.C. § 1).

10.     The charged conspiracy consisted of a continuing agreement, understanding, and concert of action among SCA and its co-conspirators, the substantial terms of which were that SCA and Company A would allocate senior-level employees by not soliciting each other's senior-level employees across the United States.

<u>MEANS AND METHODS OF THE CONSPIRACY</u>

11.     For the purpose of forming and participating in the charged conspiracy, SCA and its co-conspirators, among other things, did the following:

(a) participated in meetings, conversations, and communications with co-conspirators to discuss the solicitation of senior-level employees of defendant and Company A, including specific senior-level employees of defendant and Company A—for example, on or about May 14, 2010, Individual 2 emailed other employees of Company A, stating "I had a conversation w [Individual 1] re people and we reached agreement that we would not approach each other's proactively";

(b) agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees;

(c) instructed certain executives, employees, and recruiters not to solicit senior-level employees of each other's companies—for example, on or about November 11, 2013, a senior human resources employee at Company A instructed a recruiter "Please do not schedule a call w/[candidate], thanks. She would have had to apply for the job first.  We cannot reach out to SCA folks.  Take any SCA folks off the list.";

(d) monitored compliance with the agreement by requiring senior-level employees of defendant and Company A who applied to the other company to notify their current employer that they were seeking other employment in order for their applications to be considered—for example, on or about October 16, 2015, Individual 1 emailed a human resources executive at SCA:  "Putting two companies in italics ([Company A] and [Company B]) - we can recruit junior people (below Director), but our agreement is that we would only speak with senior executives if they have told their boss already that they want to leave and are looking.";

(e) informed senior-level employees of SCA and Company A who were candidates for employment at the other company that they were required to provide such notice to their current employer—for example, on or about November 1, 2013, employees of Company A discussed whether to interview a candidate employed by SCA in light of the "verbal agreement with SCA to not poach their folks…"  Individual 2 replied "We do have that agreement and want to stick by it.  If [candidate] indeed did approach

us, and is willing to tell [Individual 1] that I'm ok." The senior human resources employee at Company A commented "Yikes, she is not going to want to do that. But I will check.";

(f) alerted co-conspirators about instances of recruitment of employees of SCA and Company A and took steps to remedy violations of the agreement—for example, on or about December 8, 2015, Individual 2 informed Individual 1 "Just wanted to let you know that [recruiting company] is reaching out to a couple of our execs. I'm sure they are not aware of our understanding." Individual 1 instructed other executives of SCA: "We should continue to flag [Company A] on our 'do not call' list to recruiters – is OK if we get an inbound inquiry and the leader has communicated within [Company A] that they want to leave, but outbound calls should not be occurring."; and

(g) refrained from soliciting each other's senior-level employees—for example, believing a candidate to be employed by SCA, a human resources employee of Company A emailed a recruiting coordinator for Company A on or about July 17, 2017, that although the candidate "look[ed] great" she "can't poach her."

## TRADE AND COMMERCE

12.     The business activities of SCA and its co-conspirators that are the subject of this Count were within the flow of, and substantially affected, interstate trade and commerce. For example:

(a) SCA and Company A employed senior-level employees in various states across the United States; and

(b) the conspiracy would restrict the interstate movement of senior-level employees between SCA and Company A.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

COUNT TWO
Conspiracy in Restraint of Trade to Allocate Employees
(Violation of 15 U.S.C. § 1)

At times relevant to this Count:

13.     Paragraphs 2, 3, 7, and 8 are realleged and incorporated herein.

14.     Company B was a company organized and existing under the laws of
Delaware with its principal place of business in Denver, Colorado.  Company B owned
and operated outpatient medical care facilities across the United States and employed
individuals to operate its business at its headquarters location and at other locations
across the United States.

15.     Individual 3 served as the CEO of Company B.

16.     SCA and Company B were competitors in the recruitment and retention of
senior-level employees across the United States.

17.     Beginning at least as early as February 2012 and continuing until at least as
late as July 2017, the exact dates being unknown to the Grand Jury, in part in the
Northern District of Texas and elsewhere, SCA and Company B entered into and engaged
in a conspiracy to suppress competition between them for the services of senior-level
employees by agreeing not to solicit each other's senior-level employees.  The conspiracy
engaged in by SCA and co-conspirators was a *per se* unlawful, and thus unreasonable,
restraint of interstate trade and commerce in violation of Section 1 of the Sherman Act
(15 U.S.C. § 1).

18.     The charged conspiracy consisted of a continuing agreement,
understanding, and concert of action among SCA and its co-conspirators, the substantial

terms of which were that SCA and Company B would allocate senior-level employees by not soliciting each other's senior-level employees across the United States.

MEANS AND METHODS OF THE CONSPIRACY

19.   For the purpose of forming and participating in the charged conspiracy, SCA and its co-conspirators, among other things, did the following:

> (a) participated in meetings, conversations, and communications with co-conspirators to discuss the solicitation of senior-level employees of defendant and Company B, including specific senior-level employees of defendant and Company B—for example, on or about October 20, 2014, Individual 3 emailed Individual 1 that "Someone called me to suggest they reach out to your senior biz dev guy for our corresponding spot. I explained I do not do proactive recruiting into your ranks.";
>
> (b) agreed during those meetings, conversations, and communications not to solicit each other's senior-level employees;
>
> (c) instructed certain executives, employees, and recruiters not to solicit senior-level employees of each other's companies—for example, on or about December 12, 2015, SCA's human resources executive emailed a recruiter stating that "note that [Company A] and [Company B] are off limits to SCA.";
>
> (d) monitored compliance with the agreement not to solicit employees by requiring senior-level employees of defendant and Company B who applied to the other company to notify their current employer that they were

seeking other employment in order for their applications to be considered—
for example, on or about October 16, 2015, Individual 1 emailed SCA's
human resources executive: "Putting two companies in italics ([Company
A] and [Company B]) - we can recruit junior people (below Director), but
our agreement is that we would only speak with senior executives if they
have told their boss already that they want to leave and are looking.";

(e) informed senior-level employees of SCA and Company B who were
candidates for employment at the other company that they were required to
provide such notice to their current employer—for example, on or about
April 26, 2016, SCA's human resources executive emailed a candidate
from Company B who was based in Dallas, Texas, that she could not
recruit from Company B "unless candidates have been given explicit
permission by their employers that they can be considered for employment
with us.";

(f) alerted co-conspirators about instances of recruitment of employees of SCA
and Company B and took steps to remedy violations of the agreement—for
example, on or about June 13, 2016, an employee of SCA relayed a
recruitment noting that "I thought there was a gentlemen's agreement
between us and [Company B] re: poaching talent." An executive for SCA
replied "There is. Do you mind if I share with [Individual 1], who has most
recently addressed this with [Individual 3]." Individual 1 relayed the
instance of recruitment to Individual 3 who replied "Will check it out"; and

(g) refrained from soliciting each other's senior-level employees—for example, on or about April 7, 2017, Individual 1 was contacted by a consultant regarding his interest in a candidate employed by Company B, and Individual 1 responded: "In order to pursue [candidate], he would need to have already communicated that he is planning to leave [Company B] – that's the relationship that we have with [Company B]." The consultant responded, "… I'm glad you arrived at that agreement with [Individual 3]."

### TRADE AND COMMERCE

20. The business activities of SCA and its co-conspirators that are the subject of this Count were within the flow of, and substantially affected, interstate trade and commerce. For example:

(a) SCA and Company B employed senior-level employees in various states across the United States; and

(b) the conspiracy would restrict the interstate movement of senior-level employees between SCA and Company B.

ALL IN VIOLATION OF TITLE 15, UNITED STATES CODE, SECTION 1.

A TRUE BILL

_____
FOREPERSON

MAKAN DELRAHIM
Assistant Attorney General

RICHARD A. POWERS
Deputy Assistant Attorney General

MARVIN N. PRICE, JR.
Director of Criminal Enforcement

JAMES J. FREDRICKS
Chief, Washington Criminal II Section


Antitrust Division
U.S. Department of Justice

MEGAN S. LEWIS
Assistant Chief
DC Bar No. 500720
Telephone: 202-598-8145
Fax: 202-514-9082
Email: megan.lewis@usdoj.gov

WILLIAM VIGEN
Trial Attorney
DC Bar No. 997316
Telephone: 202-353-2411
Fax: 202-514-9082
Email: william.vigen@usdoj.gov

Antitrust Division
U.S. Department of Justice
Washington Criminal II Section
450 5th Street NW
Washington, DC 20001


ERIN NEALY COX
UNITED STATES ATTORNEY

MARY WALTERS
Assistant United States Attorney
Texas State Bar No. 24003138
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone:  214-659-8600
Fax:  214-659-8812
Email:  mary.walters@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

SURGICAL CARE AFFILIATES, LLC
and SCAI HOLDINGS, LLC

INDICTMENT

15 U.S.C. § 1
Conspiracy in Restraint of Trade to Allocate Employees
(Counts 1 and 2)

2 Counts

A true bill rendered

DALLAS                                                                FOREPERSON

Filed in open court this _5_ day of January, 2021.

**No Warrant Needed**

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending